

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-10-2004

# USA v. Smith

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2265

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Smith" (2004). *2004 Decisions.* Paper 404.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/404

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-2265

UNITED STATES OF AMERICA

v.

BENJAMIN SMITH,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 02-cr-0030)
District Court: Hon. Stewart Dalzell

Submitted pursuant to Third Circuit LAR 34.1(a)
June 25, 2004

Before: NYGAARD, McKEE and CHERTOFF,
*Circuit Judges*

(Opinion filed: August 10, 2004)

OPINION

McKEE, *Circuit Judge*.

Benjamin Smith appeals the district court's judgment of conviction and sentence.

For the reasons that follow, we will affirm.

**I.**

On September 7, 2001, Philadelphia Police Officers Jerold Seiple and Nate Smith

1

were riding in a marked patrol car in Philadelphia, Pennsylvania when, around 2 a.m., they saw a green Lexus operating without its headlights. After a radio check confirmed that the car's license plate had expired they pulled the Lexus over near the intersection of 4th Street and Lehigh Avenue.

Officer Seiple approached the driver's side of the Lexus and asked Smith, who was in the driver's seat, for his license and registration. Smith replied that he only had an ID card and then reached into his left pocket with his left hand as he reached over toward the glove box. As he reached, Officer Seiple saw the butt of a handgun protruding from Smith's waistband, and he asked Smith if he had any weapons in the car. Smith denied that he did and Seiple asked Smith to get out of the car. Smith responded by kicking the door open and climbing between the door and the door frame. Seiple then grabbed Smith by his sweatshirt and Smith and Seiple fell backward. A struggle then ensued between Officer Seiple, Officer Smith, and defendant Smith. During that struggle, the defendant pointed the gun at the police officers, but they were eventually able to knock the gun away. Officer Smith then threw the weapon on top of the police car and out of the defendant's reach. At some point during the struggle, the defendant stated that he was not going back to jail.

Smith was ultimately subdued and arrested, and the police seized the gun. Subsequent investigation disclosed that it was an operable Smith & Wesson .9mm, semi-automatic pistol with an obliterated serial number and that it contained six rounds.

2

**II.**

A federal grand jury returned an indictment charging Smith with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The indictment also contained a notice of forfeiture for the Smith & Wesson .9mm semi-automatic pistol and the ammunition.

On June 14, 2002, the Federal Defender's Association was appointed to represent Smith. At Smith's request, his trial was then continued until September 30, 2002. On July 31, 2002, Smith filed a *pro se* motion to suppress evidence. On August 1, 2002, he filed a *pro se* motion to dismiss the indictment for lack of subject matter jurisdiction based upon a theory that Congress lacked the authority to enact the felon in possession statute. The district court relied on *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001), in dismissing that motion.

On August 9, 2002, Smith filed a motion to dismiss the indictment based on the Second Amendment. On September 4, 2002, he filed another *pro se* motion to dismiss the indictment and the next day he filed a *pro se* addendum to his *pro se* motion to dismiss. He thereafter filed an amended *pro se* motion to dismiss. The district court denied these motions by order dated September 20, 2002. His earlier suppression motion was denied following an evidentiary hearing, and the matter proceeded to a jury trial.

At trial, the testimony of ATF Special Agent James Juvena was admitted without objection. He testified that the gun had been manufactured in Massachusetts, and that

3

parts had been manufactured in Maine and Minnesota. The parties also stipulated that Smith had previously been convicted of a crime punishable by imprisonment for a term exceeding one year.

On the first day of trial, September 30, 2002, the district court re-opened the suppression motion and permitted Smith to personally argue another *pro se* motion, i.e., that the stop of his car violated the Fourteenth Amendment's Equal Protection Clause. At the conclusion of the first day of trial, the district court denied that motion, the trial continued, and the jury convicted Smith.

On October 3, 2002, Smith sent a letter and accompanying affidavit to the district court, alleging, *inter alia*, that trial counsel was ineffective for denying him the right to testify.[1]   On October 8, 2002, Smith filed a *pro se* motion for withdrawal of trial counsel. The court granted that motion on October 12, 2002, and appointed new counsel for Smith.  On November 27, 2002, Smith filed a *pro se* motion for judgment of acquittal and new trial pursuant to Fed.R.Crim.P. 29, 33 and 34, in which he repeated his claim of ineffectiveness of trial counsel.

On April 15, 2003, the district court held a hearing to address all outstanding motions.  The witnesses included Defender Association attorneys Kenneth Edelin and Leigh Skipper, and the defendant's mother, Sheketter Smith.  Thereafter, the court

---

[1] The district court ordered the letter and affidavit docketed as a motion for a new trial under Fed.R.Crim.P. 33.

denied all of the outstanding motions and Smith was subsequently sentenced to 120 months incarceration plus a term of supervised release, a special assessment and a fine. Smith filed a timely appeal. However, on April 29, 2003, he filed a *pro se* motion for reduction of sentence under Fed.R.Crim.P. 35(b). The district court caused this motion to be docketed under Rule 35(a), as a motion for correction of sentence caused by error, and thereafter denied it.

### III.

Smith's appointed counsel has filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), stating that he is unable to identify any non-frivolous issue for review. An appointed appellate counsel who "finds [a] case to be wholly frivolous, after a conscientious examination of" the case, must so advise the court of appeals and request permission to withdraw. *Anders*, 386 U.S. at 744 (1967). Counsel's request must be accompanied by a "brief referring to anything in the record that might arguably support the appeal." *Id.* The brief must identify any "issue arguably supporting the appeal even though the appeal was wholly frivolous," *Smith v. Robbins*, 528 U.S. 259, 285 (2000), "explain why the issues are frivolous," *United States v. Marvin*, 211 F.3d 778, 781 (3d Cir. 2000), and show that counsel "thoroughly scoured the record in search of appealable issues." *Id.* at 780; *see also United States v. Youla*, 241 F.3d 296, 300 (3d Cir. 2001).

Counsel's *Anders* brief refers us to the portions of the record that arguably present non-frivolous issues and he identifies the following issues: the credibility of trial

5

witnesses and the sufficiency of the evidence at trial. However, Smith's counsel has concluded that any claim of error would be frivolous and we agree for the reasons explained in the *Anders* brief.

Smith has also filed a *pro se* brief raising the following issues: (1) ineffectiveness of trial counsel; (2) the validity of the traffic stop under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment; (3) an alleged *Brady* violation; (4) erroneous jury instructions; and (5) a due process challenge to § 922(g). We will address each argument below.

### A. Ineffectiveness of trial counsel.[2]

As noted, the day after his conviction, Smith wrote a letter to the district court alleging that his trial counsel was ineffective because they would not let him or his brother testify at trial. He subsequently filed a *pro se* § 2255 motion reiterating his claim of ineffectiveness, and moved for a new trial under Rules 29, 33 and 34. The district court appointed new counsel and held an evidentiary hearing before denying the post-trial claims. Smith challenges that ruling on appeal.

Smith's trial counsel, Federal Defenders Leigh Skipper and Kenneth Edelin, testified that although Smith initially said that he wanted to testify, they strongly advised against it, since Smith would thereby open himself up to damaging impeachment based

[2]We exercise plenary review over the district court's legal conclusions and apply a clearly erroneous standard to the court's factual findings. *United States v. Cepero*, 224 F.3d 256, 258 (3d Cir. 2000) (en banc).

on his two prior robbery convictions. Trial counsel believed it more prudent to impugn the credibility of the police officers rather than advise Smith to take the stand. The trial transcript reflects counsels' attempts to aggressively impeach the officers' testimony and to exploit alleged discrepancies between their testimony and their reports.

Defense counsel also presented evidence to suggest that the police officers assaulted Smith in the hospital after his arrest. This included testimony from a Temple University emergency room physician, Dr. Schwell, regarding contusions on Smith's forehead, lip and back following the arrest. The physician also testified that Smith had reported being assaulted by police while in the hospital and that an officer came into the emergency room and hit Smith in the mouth.

Counsel also testified that, prior to trial, Smith claimed that his brother ("Andre") could testify that he had loaned Smith his car. Smith had told counsel that the police took the gun from the trunk of the car. Counsel interviewed André on the Friday before trial but concluded that Andre would not be helpful. Although they thought him credible, he was reluctant to testify. He confirmed that he had loaned the car to Smith, but claimed to know nothing about any gun in the trunk.

On the Monday morning of trial, André sought out counsel and told them that he loved his brother and that he wanted to testify. However, André was concerned about getting into trouble and told counsel he was not going to lie. He then showed counsel a letter from the defendant in which the defendant had asked André to say that he loaned

7

the car to someone else before he loaned it to Smith.  Attorney Skipper specifically

recalled the portion of the letter that said "tell them – someone whose name I forgot –

had the car.  They'll never find him because he's dead."   Defense counsel and André

both interpreted this as an attempt to suborn perjury and counsel responded by telling

André that he would not be called as a witness. Counsel also told Smith that they would

have to ask the court to remove them if he decided to testify because they refused to

assist his perjury. Smith did not testify.

At the conclusion of the government's case, the court granted a recess for counsel

to confer with Smith.  Counsel once again told Smith that he had a right to testify, but

they recommended against it.   Counsel testified that Smith was dissatisfied with counsel

and wanted his mother's advice.  Skipper then conferred with Mrs. Smith.  He told her

that he and Edelin recommended against Smith testifying.  When Smith made an inquiry

of his mother about testifying, Mrs. Smith shook her head "no" and told Skipper that she

also believed that Smith should not testify.[3]     Smith testified during the post-trial

hearings that when he first met Edelin and told him that he wanted to testify at trial,

Edelin had no response whatsoever.  Smith claimed that neither of his attorneys ever told

him that he had the right to testify.  He admitted, however, that counsel believed he

should not testify because of potentially damaging revelations concerning his prior

---

[3] Edelin's recollection is consistent with Skipper's. Both counsel believed that Smith acquiesced after consulting with his mother.

convictions. Yet, according to Smith, during discussions of trial strategy, when he told both counsel that he wanted to testify and that he was serious about it, both counsel started laughing and joking. Accordingly to Smith, his brother was prepared to testify that the firearm was in the trunk of the car which André had loaned to him. Smith claims that counsel never explained why they would not call André as a witness other than Skipper saying that his trial experience led him to believe that the jury had a doubt. Not surprisingly, André Smith did not testify during the post-trial hearing on the defendant's ineffectiveness claim.

The district court accepted the testimony of Skipper and Edelin and rejected Smith's testimony about his decision not to testify. Nothing on this record suggests that the court's credibility determination was clearly erroneous. In fact, Smith's claim that counsel refused to comply with his decision to testify is belied by the record. In the letter he wrote to the district court the day after his conviction complaining about his counsel's ineffectiveness, Smith wrote that he told his lawyers that he would not testify if his mother told him not to. He also wrote that "my mother told me don't testify and I listened even though I wanted to testify." Supp. App. 356.

Smith's post-trial testimony also shows that he voluntarily relinquished his right to testify. Smith admitted that he told counsel that the only person who could tell him not to testify was his mother. When he saw his mother shake her head "no" while speaking to Skipper, he thought that she did not want him to testify. He then explained, "[s]o, I

9

didn't testify." Supp. App. 275. Under these circumstances, the district court properly accepted the defense attorneys' reasonable belief that Smith had assented to their recommendation that he not testify. The district court also correctly noted that counsel acted ethically in advising Smith that they would move to withdraw if Smith decided to testify. *Nix v. Whiteside*, 475 U.S. 157, 171 (1986). We will not now allow Smith to spin counsel's ethical conduct into a claim of ineffectiveness.

Smith also claims that counsel was ineffective for not calling a hospital triage nurse to testify. He claims that she would have testified about injuries he had when admitted to the hospital following his arrest. Purportedly, she would have testified that some of the injuries noted in hospital records resulted from the arresting officers punching Smith in the hospital. In his view, had this information been provided to the jury, the police officers' credibility would have been undermined since they testified that they went to the hospital only to identify Smith.

However, the nurse's purported testimony would have been cumulative in light of Dr. Schwell's testimony. Schwell's testimony raised a question about the officers' credibility and we can not, therefore, conclude that defense counsel were ineffective in failing to call another witness to testify about the same thing.

Smith also claims that counsel were ineffective for failing to object to the jury instruction concerning constructive possession of a firearm. In order to prevail on this claim, Smith must show that counsel's failure to object to this instruction was an error

"so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and he must also show that his counsel's deficient performance resulted in prejudice. The Supreme Court has defined prejudice as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The district court's charge was taken directly from Sand's *Modern Federal Jury Instructions*, and counsel's failure to object to a standard jury charge can hardly be viewed as so inept as to fall outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; Supp. App. 388. Moreover, Smith cannot show prejudice because the district court also instructed on actual possession. The jury obviously accepted the police officers' version of what happened, and their testimony establishes *actual* possession.

Finally, Smith claims that counsel erred in not properly articulating a theory of cross-examination and thereby depriving him of his Sixth Amendment right to confront witnesses against him. At trial, defense counsel attempted to question Officer Seiple on his knowledge of police directives concerning the use of deadly force, but the government objected. At a sidebar, counsel said that he wanted to bring out that, if the police really believed they were threatened when Smith pointed his weapon at them, they would have been justified in shooting him. The district court found that the line of questioning was unnecessarily confusing since there was no shooting and it precluded

11

further questioning.

Smith claims that counsel was ineffective because they did not argue that the testimony showed bias. However, Smith's defense was that the police officers' version of the incident was not credible, not that the police were biased. Smith's Sixth Amendment challenge to his attorneys' stewardship is utterly frivolous.

## B. Traffic stop.[4]

Smith reiterates his suppression motion argument that the traffic stop violated the Fourth Amendment because the police officers never wrote citations for traffic violations. He also claims that the stop violated the Equal Protection Clause of the Fourteenth Amendment because the stop was racially motivated. Smith is an African-American male. He argues that the arresting police officer testified that factors such as the defendant's race, the price of his automobile and the neighborhood in which he traveled were all factors in the officer's decision to stop the car. Not surprisingly, Smith provides no record citation for those allegations.

During cross-examination, Officer Smith did agree with defense counsel's characterization that the Lexus Smith was driving was a "high-end" car; it was. Defense counsel also elicited testimony that the police recognized the gender and race of the

---

[4]We review the district court's denial of a motion to suppress for clear error as to the underlying factual findings but we exercise plenary review of the district court's application of the law to those facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

driver of the car before it was stopped. Counsel brought out that Smith was not ticketed for the expired tag or failure to use his headlights, both of which are violations of the traffic code.

Nevertheless, the testimony at the suppression supported the court's finding that the police officers stopped the car only because they were suspicious of a car being driven at 2 a.m. in a high-crime area without headlights and with an expired registration. Officer Smith testified that he had been patrolling the area for about six years, and that he knew it to be a high-crime area, with numerous shootings, robberies and drug-related crimes. During cross-examination, Office Seiple reiterated that his attention was drawn to the Lexus only because the headlights were out, and that the car was stopped only after the police learned that the registration had expired.

Officer Seiple admitted that neither his nor Officer Smith's police "48," contained a statement about the Lexus being driven without headlights.[5] However, Officer Seiple's investigation interview memorandum, a more detailed handwritten account of the incident prepared shortly after the 48, did note that the Lexus had an expired tag and no headlights. In addition, Officer Smith's memorandum, prepared the same day, confirmed that he stopped the defendant because the car was operating without headlights at 2:00 a.m. and the radio check disclosed an expired registration.

---

[5]The officers' 48s did contain statements that the car was being driven with an expired tag.

13

Accordingly, the district court correctly found that the officers had the authority to stop Smith's car. *United States v. Moorefield*, 11 F.3d 10, 12 (3d Cir. 1997).

Moreover, the absence of traffic citations does not impair the validity of the traffic stop. The officers apparently thought the fact that Smith pointed a gun at them and announced that he wasn't going back to prison was a bit more weighty than the fact that the car he was driving also had an expired registration and no headlights. Accordingly, Smith's argument is simply not compelling.

The district court believed that Smith had committed a traffic infraction and that he was legally stopped because of it. Once the police stopped Smith and saw the gun, they were clearly justified in arresting him and seizing the weapon after the ensuing scuffle.

At the hearing the district court allowed Smith to make a lengthy argument in support of his Equal Protection Claim. Smith argued that he was stopped because he was a Black man driving a Lexus in a high-crime area. The district court rejected that argument based upon the credible testimony regarding the traffic violations, and nothing in Smith's *pro se* brief convinces us the district court erred.

### C. Failure to disclose *Brady* material.

Smith argues that the government violated the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963) because it "ambushed him with Brady material." Smith's Br. at 23. He refers to Government Exhibit 3, a computerized record of calls to the

14

Philadelphia Police radio room, which was introduced into evidence by the government without objection from defense counsel.[6]  Smith claims that counsel was unfamiliar with the radio log and could not properly confront the government's "timeline." *Id.*

The government introduced the radio log to frame the time of the events.  The log noted that the traffic stop was at 1:53 a.m., the call was changed to officer assist within the minute and, at 1:54 a.m., the log notes "male apprehended."  Thus, the log shows that the entire episode after the car stop took approximately one minute.  Smith argues that, since Officer Seiple's investigative report notes that the struggle took two to three minutes, a serious contradiction exists between the radio log and Officer Seiple's testimony.

The government claims that the radio log was given to the defense, but it does not say when.  In any event, assuming *arguendo* that the radio log was not properly turned over, we still fail to see how Smith's defense was prejudiced.  The radio log does not

---

[6]Because there was no objection to the admission of the radio log, we review for plain error. *United States v. Boone*, 279 F.3d 163, 174 n.6 (3d Cir. 2002).  It is Smith's burden to establish plain error. *United States v. Olano*, 507 U.S. 725, 734-35 (1993).  To do so, he must prove: (1) that the court erred; (2) the error was obvious under the law at the time of review; and (3) the error affected substantial rights, that is, the error affected the outcome of the trial. *Johnson v. United States*, 520 U.S. 461, 467 (1997).  If all three elements are established, the reviewing court may exercise its discretion to afford relief.  That discretion should be exercised only in cases where the defendant is "actually innocent" or the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (citation omitted).  The "plain-error exception to the contemporaneous objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15 (1985) (citation and internal quotations omitted).

amount to impeachment. At best, it suggests that the officers simply thought that the struggle took two minutes longer than it actually did. Since they were wrestling with an armed suspect who had pointed a gun at them and proclaimed he wasn't going back to jail, it is not hard to conclude that their measure of time was a bit less accurate than that of a finally tuned stop watch.

The police testified that Smith was taken from the scene by a police transport van and taken to the hospital for treatment. The arresting officers went to the hospital to get Smith's name and ID card, then arrived at the police station at approximately 2:42 a.m. This time is confirmed by the radio log. Officer Seiple testified that he and Officer Smith first completed their 48s, approximately 10 to 15 minutes later.

Smith contends that the hospital records, introduced as a defense exhibit, show that he did not arrive at the hospital until 2:43 a.m., one minute after the police say that had returned to East Detectives. In Smith's view, this demonstrates the impossibility of the officers' testimony. However, Smith has ignored the testimony of his own witness, Dr. Schwell, the hospital emergency room physician, who testified that he treated Smith at approximately 2:15 a.m. Therefore, the uncontradicted testimony shows that Smith was taken from the scene after 1:54. He was taken to the hospital where he was treated in the emergency room at 2:15 a.m., and thereafter; the police went to the hospital to get Smith's identification and returned to East Detectives at approximately 2:42 a.m. to begin their reports. We therefore fail to see any *Brady* impeachment material in the

16

radio logs.

Smith also claims that the radio log confirms his contention that the police stopped him, then searched the trunk of the car where they found the gun. He contends that was done during the "unaccounted for" time between 1:49 a.m., when the first radio call was made by the police, and 1:53 a.m. when they stopped his car. That argument ignores the undisputed testimony that after 1:49 a.m., when the police were informed that the registration had expired, they made a U-turn, pulled behind Smith and stopped his car at approximately 1:53 a.m. There is no impeachment material in the radio log as to this issue either.

In short, there was no *Brady* violation.

## D. Improper jury instruction.

Smith repeats the argument he made in his post-trial motions that the interstate portion of the felon-in-possession jury charge was improper. Because Smith did not object to the instruction, it is reviewed for plain error. *United States v. Antico*, 272 F.3d 245, 265 (3d Cir. 2001).

The challenged jury instruction was as follows:

> Finally, as to the third element, you must find that the firearm traveled in interstate commerce. Commerce means trade, traffic or communication between or among the several states. The government does not have to prove that the defendant himself carried it across state lines. In this regard, there has been evidence that the firearm in question was manufactured in a state other than Pennsylvania. You are permitted to infer from this fact that the firearm traveled in interstate commerce. However, you are not required to do so.

17

Smith argues that the use of "must" in the first sentence demands that the jurors accept the fact that the firearm previously moved in interstate commerce. We disagree. "Must" simply emphasizes to the jury that the government must prove that the firearm traveled in interstate commerce. Smith also contends that the jury likely misunderstood the instruction concerning the use of the word "fact" and thought it meant that it should accept the government's theory of interstate movement of the gun. Again we disagree. "Fact" means only that the jury could infer that the firearm had moved in interstate commerce if it credited the testimony that the firearm had been manufactured outside of Pennsylvania.

### E. Due process violation.

Smith's last argument is that the "felon element" of § 922(g) violates his due process rights. Smith contends that because he is entitled to the presumption of innocence as to every element of the offense, the introduction of the fact that he was a convicted felon does not comport with due process. He claims that allowing the jurors to know he was a felon resulted in unfair prejudice. However, a due process violation does not necessarily follow. *See Old Chief v. United States*, 519 U.S. 172, 189-192 (1997). Moreover, careful *voir dire* can help insure that jurors who would be influenced by knowledge of the element of a prior felony conviction are not chosen for the jury. There is no allegation that any juror who was seated here indicated that he/she would be unable to afford Smith the presumption of innocense because of a prior felony conviction.

18

Accordingly, we also conclude this argument is meritless.

## IV.

For all of the above reasons, we will affirm the judgment of conviction and sentence.